# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

```
---------------------------------------------------- x
ANDREA ADAMS, as parent/guardian and          )
next friend of B.E.M. and  B.J.M., minors,     )
                                               )
            Plaintiff,                         )
                                               )    Case No. 1:23-cv-00985
      v.                                       )
                                               )    Hon. Sara L. Ellis
YMCA OF METROPOLITAN CHICAGO,                  )
LLC, an Illinois limited liability company,    )
                                               )    INJUNCTIVE RELIEF SOUGHT
            Defendant.                         )
---------------------------------------------------- x
```

## VERIFIED AMENDED COMPLAINT

Plaintiff Andrea Adams ("Plaintiff"), as parent/guardian and next friend of B.E.M. and B.J.M., minors, by and through her attorneys, ASHMAN LAW OFFICES, LLC, for her Verified Amended Complaint (the "Complaint") against Defendant YMCA of Metropolitan Chicago LLC ("Defendant" or the 'YMCA"), an Illinois limited liability company, alleges, upon knowledge as to herself and her own acts, and otherwise upon information and belief, as follows:

## NATURE OF THE ACTION

1.  Plaintiff brings this action on behalf of her two minor children, each of African American heritage and each suffering from disabilities, to remedy racial and disability discrimination in violation of Title II and Title VI of the Civil Rights Act of 1964 (the "Civil Rights Act"), 42 U.S.C. §§ 2000a, 2000d, *et seq.*, Title III of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12181, *et seq.*, and section 504 of the Rehabilitation Act (the "Rehabilitation Act"), 29 U.S.C. § 794.  The acts in which Defendant engaged, as detailed below, also give rise to claims under the Illinois Human Rights Act, 775 ILCS 5/5-101, *et seq.*; and to claims under the common law.  Plaintiff seeks injunctive relief, actual damages, and an award of attorneys' fees.

**JURISDICTION AND VENUE**

2.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under the Civil Rights Act, the ADA and the Rehabilitation Act. The Court has jurisdiction over Plaintiff's state law claims under 28 U.S. Code § 1367.

3.     Venue is proper under 28 U.S.C. § 1391 because the events or omissions giving rise to these claims occurred in this District.

**PARTIES**

4.     B.E.M. and B.J.M. are minors residing with their mother, Plaintiff Andréa Adams, in Cook County, Illinois.

5.     Defendant is a community health and wellness club, registered to do business in Illinois and operating several facilities in Chicago, Illinois.  Defendant's facilities, including the facility located at 1834 N. Lawndale Avenue, Chicago, IL 60647 (the "McCormick YMCA"), are places of public accommodation.

6.     At all times relevant to the allegations of this Complaint, Defendant and the McCormick YMCA have engaged in business affecting commerce.

**FACTS**

7.     At all times relevant to the allegations of this Complaint, B.J.M. has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD").  B.J.M.'s condition is permanent, and B.J.M. has been at all times relevant to the allegations of this Complaint receiving medical treatment for it, including medication and therapy.  Behaviors associated with ADHD include wandering off, talkativeness and impulsivity.  As a result, B.J.M. needs frequent redirection.

8.     Defendant and the McCormick YMCA hold programs for children, including summer day camps.  Plaintiff decided to enroll her children, B.J.M. and B.E.M., into the summer day camp program for the summer of 2020.

9.      Due to B.J.M.'s diagnosed disability, Plaintiff communicated with representatives of Defendant to ensure proper accommodations for B.J.M., prepare Defendant and its staff for B.J.M.'s disability and concomitant behavior, prepare a plan in advance of B.J.M.'s arrival to address his and the other campers' needs, and ensure good communication between Plaintiff and Defendant, among other goals.  Plaintiff communicated with, among others, Gretchen Dennis ("Dennis"), Defendant's Director of Inclusion.

10.      As a result of these communications, Defendant developed a written support/inclusion plan (the "Inclusion Plan") for B.J.M.  A copy of the Inclusion Plan is attached hereto as Exhibit A (redacted as to B.J.M.'s full name).  The Inclusion Plan was created and signed by Dennis.  It was also signed by Spencer Barclay ("Barclay"), the Program Director for the 2020 summer camp at the McCormick YMCA, and Plaintiff.  Dennis circulated the Inclusion Plan to staff at the McCormick YMCA as early as July 13, 2020, including in the same .pdf file a document summarizing so-called "restorative practices" to be used by the staff to address incidents that may occur during camp (the "Restorative Practices Guide").  A copy of the Restorative Practices Guide is attached hereto as Exhibit B.

11.      Based upon and in reliance on the faithful implementation of this Inclusion Plan, Plaintiff felt assured to send B.J.M. to Defendant's summer day camp in the summer of 2020.  Plaintiff also enrolled her other child, B.E.M., into the summer day camp program.  Plaintiff's children were enrolled from July 6-August 21, 2020.

12.      B.E.M. also suffers from ADHD, and, although he exhibited symptoms during the summer of 2020, he was not formally diagnosed until 2023.

13.      As a signatory to the Inclusion Plan, Barclay was aware of B.J.M.'s special needs and of the Inclusion Plan's provisions.  Despite this, Barclay failed to take appropriate steps to

implement the Inclusion Plan and curtail the discriminatory and other wrongful conduct alleged herein. Both Dennis and Barclay are non-black and, upon information and belief, non-disabled.

14. By way of short background, prior to the events occurring in the summer of 2020, two years earlier, Plaintiff had enrolled both B.E.M. and B.J.M. in Defendant's summer camp program located at 3333 N. Marshfield Avenue, Chicago, IL 60657 (the "Lake View YMCA"). The children attended camp at the Lake View YMCA without material incident or disruption. Even earlier, from and about 2014 through 2017, Plaintiff enrolled B.E.M. and B.J.M. in various programs in Defendant's facilities, both during the school year and during the summers, all without material incident or disruption. Plaintiff enrolled her children in the McCormick YMCA in 2020 only because no space was then-available at the Lake View YMCA location.

15. During the summer of 2020, B.J.M. displayed the anticipated behavior, which included wandering off, not following directions given by staff, and grabbing another camper's backpack. As noted, B.E.M. also engaged in conduct symptomatic of a child with ADHD.

16. As a result of B.J.M.'s and B.E.M.'s conduct, representatives of Defendant contacted Plaintiff almost daily, often calling to request that Plaintiff pick up her children early, purportedly on account of their behavior. On at least one occasion, either B.J.M. or B.E.M., or both, were punished by Defendant with a one-day suspension from camp.

17. Upon information and belief, other children displayed similar behavior to that imputed to B.J.M., but were not disciplined in the same way, by dis-enrollment, suspension, or their parents being called for early pick-up due to their behavior. Indeed, the other children's behavior was imputed to B.J.M. and/or B.E.M.

18. For example, on July 17, 2020, another child, named "Ronan," engaged in behavior similar to B.J.M.'s, in that he hit B.E.M. with a "pool noodle." As a result, B.E.M. complained to counselor Marlen Cuevas that his ear bothered him, which still bothered him three days later.

Ronan, who is not African American, was not dis-enrolled or suspended, and his parents were not called about his behavior.

19.     On another occasion, a female camper took B.J.M.'s backpack and, thereafter, hit him.  B.J.M. then responded by taking her backpack and hitting her.  The female camper is not African American.  B.J.M. was removed from the group and suspended for the day; yet, the female camper suffered no consequences.

20.     In July 2020, one of Defendant's employees, Deshaun Northern, who served as Team Lead-Youth at the McCormick YMCA, made a statement that negated the importance and impact of B.J.M.'s disability, telling Plaintiff at one point that "just because B.J.M. has ADHD," before Plaintiff cut him off, reminding him of the importance to refrain from discounting her son's disability.

21.     On July 27, 2020, B.J.M. expressed suicidal ideation to Barclay, who brought B.J.M. to the office of Bridget Rundquist, Defendant's Director of Youth Programming.  Neither on this occasion nor on a subsequent expression of similar thoughts on August 13, 2020, discussed below, did Barclay, Rundquist or any other personnel contact any mental health professional to obtain advise as to how to handle the situation or to counsel B.J.M.

22.     After an incident on July 31, 2020, during which B.E.M. ran out of the gym and away from counselors, B.E.M. told Plaintiff he felt he needed to run out because he did not feel heard, and that the counselors treated him unfairly, calling him out but not the other children.  Around the same time, another employee of Defendant, "Coach Sean," forcibly grabbed B.E.M. to bring him to the office at the McCormick YMCA.  The conduct was so aggressive that B.E.M. complained of pain in his side and abdomen, forcing Plaintiff to take him to the emergency room of a hospital to receive treatment.

23.     While Defendant's staff readily contacted Plaintiff to report her children's misbehavior and request early pick-up, the staff was considerably less eager to contact Plaintiff when they should have.  For example, during the week of August 10, 2020, B.J.M. fell and hit his head on the ground.  Plaintiff was not notified; yet, the fall was serious enough for Defendant's staff to treat the injury with an ice pack to reduce swelling.  Either on this occasion or another, B.J.M. hit his head due to the conduct of another camper.  Besides not contacting Plaintiff contemporaneously about the incident, the child who hit B.J.M. was not disciplined, with no write-up, no suspension, no removal from the group, and his parents were not notified.  This camper was not African American.

24.     Defendant's disparate treatment of B.J.M. had a severe emotional toll on him.  On August 13, 2020, Defendant's employee, Jeraun Pearson ("Pearson"), a counselor at the McCormick YMCA, told a group of children engaged in an activity that they all would have to stop because of the conduct of B.J.M., who repeatedly interrupted the game, explaining that a new "policy" was being implemented, where the entire group would suffer the consequences of a single camper's conduct.  This placed enormous pressure on B.J.M. because it incentivized the entire group's dislike of B.J.M.  Immediately thereafter, B.J.M. started vocalizing thoughts of suicidal ideation.

25.     Later the same day, B.J.M. explained to Barclay and Rundquist that he felt targeted by Pearson because, by announcing the new policy, Pearson had singled out B.J.M. as the cause of trouble for the entire group.  B.J.M. said that he felt that Pearson's actions signified to the other children that they should not like him, since they were all getting into trouble because of him.  Rather than console him, Barclay and Rundquist instead reprimanded B.J.M. for vocalizing thoughts of suicidal ideation as if he were not serious, even if he said he were joking, saying that B.J.M.'s obvious cry for help was "inappropriate":  "We reminded him that the things he had said were very

serious, not funny, and totally inappropriate, even if he wasn't being serious." As noted previously, no mental health professional was contacted for advice or to provide counsel to B.J.M.

26.     Around the same time, another incident occurred regarding Plaintiff's other child, B.E.M. On August 18, 2020, after an accusation that he was misbehaving, B.E.M. was removed from camp activities and placed in an office, where he was confined, causing severe emotional distress. In fact, Barclay stood in the doorway, preventing B.E.M. to leave and, ultimately, placed a chair and sat down in the doorway, imprisoning B.E.M. When Plaintiff was telephoned, B.E.M. was so distraught that it took him a few minutes even to speak with his mother, and, when he did, he said that he had been treated unfairly by the counselor involved, "Marlen."

27.     Marlen was involved in another incident days later, also involving B.E.M. On August 21, 2020, Marlen prevented B.E.M. from getting his things into his backpack, shoving him.

28.     On August 14, 2020, during a conversation between Plaintiff and Barclay, Plaintiff requested that Barclay remind the staff at the McCormick YMCA to be aware of the tone they use when instructing B.J.M., and, in particular, reminding him about wearing his mask. Barclay said that he would do so; however, either Barclay did not do as he promised or Defendant's staff ignored the reminder, as they repeatedly scolded B.J.M. for his inconsistency in wearing his mask.

29.     On August 21, 2020, Plaintiff had a meeting with Angel La Luz, Executive Director at the McCormick YMCA. During the meeting, La Luz informed Plaintiff that he was suspending Plaintiff's children from participation in the program. He said that B.J.M. and B.E.M. were "too challenging and [Defendant] did not want to continue to deal with them." La Luz said that he was suspending B.J.M. from the program due to his disability.

30.     On August 31, 2020, Plaintiff received an email from Defendant informing her that her children's participation in Defendant's program was terminated for not only the current term but for future programs as well – an effective permanent bar. The pretense offered for this decision was

for the well-being of B.J.M. and B.E.M., other children, and the staff. In reality, however, the decision had nothing to do with B.J.M.'s and B.E.M.'s well-being; instead, it had to do with Defendant's unwillingness to accept B.J.M.'s disability.

31.     Defendant never implemented the inclusion plan for B.J.M. that had been agreed upon together with Plaintiff. Indeed, upon questioning from Plaintiff, neither La Luz, Coach Sean nor any other staff member at the McCormick YMCA would recite any steps of the Inclusion Plan. No one at the McCormick YMCA followed any of the steps delineated in the Restorative Practices Guide in handling incidents concerning B.J.M.

32.     Protocol requires that, when an ice pack is administered to a camper, the event must be logged into a log book, and, when a child is hurt by another camper, the hurt child's parents must be called – neither of which occurred when these incidents involved B.E.M. In fact, Plaintiff has requested of Defendant to produce the log book involving her children, but Defendant has refused to share the information.

33.     Defendant was aware of the discriminatory practices and other wrongful conduct engaged in by its staff, but did nothing to prevent or remedy the behavior. Barclay, La Luz, Rundquist, Coach Sean, and employees Cherese Ledet ("Ledet") and Jill Doerner ("Doerner") all knew about the discriminatory treatment of Plaintiff's children, but either participated actively in subjecting B.E.M. and B.J.M. to such treatment, or did nothing to stop it from occurring. For example, when Plaintiff informed La Luz, Ledet, and Doerner about Coach Sean grabbing B.E.M. or about Counselor Marlen shoving B.E.M., neither of La Luz, Ledet, nor Doerner performed any material investigation into the facts or took any disciplinary action against the responsible staff members.

34.     On August 31, 2020, Plaintiff wrote an email to Ledet and Doerner, lodging a formal complaint against Defendant, the McCormick YMCA, and various employees. Among other things,

Plaintiff detailed several issues with the Defendant's policies, including discrimination based on race; discrimination based on disability; failure to implement an inclusion plan for a person with a disability; physical and inappropriate grabbing and shoving of a minor; harassment; failure to follow proper protocol with respect to all children; failure to enforce social distancing among campers; failure to report to a mental health professional when B.J.M. expressed thoughts of suicide; and exaggerating and being dishonest about incidents related to B.E.M. and B.J.M.'s behavior.

35.     On March 30, 2021, Plaintiff attempted to enroll her children at Defendant's Lakeview YMCA, but was barred, even though B.J.M. and B.E.M. had been participants in programs there without incident over the course of a number of years. Upon information and belief, the bar came from Rundquist and Andrew Sullivan, the Membership and Wellness Director of Defendant. This was confirmed in an April 30, 2021 email to Plaintiff from Allison Greenman, Vice President of School Age and Camp Education with Defendant, saying that Defendant was unwilling to reconsider the bar or falsely saying that Plaintiff would not work to resolve any of the issues involving her children.

36.     Similarly situated non-black and non-disabled children were treated differently than B.E.M. and B.J.M. in similar circumstances, as they were allowed to register for Defendant's 2021 summer camp.

37.     On September 1, 2020, Plaintiff filed a charge on behalf of B.J.M. and B.E.M. with the Illinois Department of Human Rights ("IDHR"). The charge was perfected on November 5, 2021. On November 9, 2022, the IDHr found that substantial evidence existed on the claims of discrimination Plaintiff alleged. On November 17, 2022, the IDHR served a Notice of Substantial Evidence as to all counts on B.J.M. c/o Plaintiff Adams. More than 30 days has passed since the IDHR and the Illinois Human Rights Commission were given written notice of the facts alleged in this Complaint.

**COUNT I**
**VIOLATION OF TITLE II OF THE U.S. 1964 CIVIL RIGHTS ACT**
**42 U.S.C. § 2000a *et seq.***

38.     Plaintiff re-alleges and re-asserts Paragraphs 1 through 37 of her Verified Complaint as though fully set forth herein.

39.     Title II of the 1964 Civil Rights Act provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a).

40.     Defendant and the McCormick YMCA are places of public accommodation under 42 U.S.C. § 2000a(b).

41.     B.J.M. and B.E.M. are both African American.

42.     Defendant discriminated against Plaintiff's children on account of their race.  As detailed above, non-black children who engaged in conduct similar to the conduct of B.J.M. and B.E.M. were treated differently, as they were not written-up, removed from the group, touched or physically restrained, suspended or dis-enrolled, or had their parents called for conduct akin to that of B.J.M. and B.E.M..  Likewise, these children and other non-black children were not barred from registering for future programs, as Plaintiff's children were.

43.     Although aware of the discriminatory treatment that B.J.M. and B.E.M. suffered, Defendant's employees either actively participated in this treatment or were unwilling to take the necessary measures to stop and remedy it.

44.     Among the other acts detailed in the Fact section above and incorporated herein by reference, by suspending B.J.M. and B.E.M. and treating them differently than non-black campers, Defendant denied B.J.M. and B.E.M. the full and equal enjoyment of its facilities, services,

privileges, and advantages, discriminating against them on the basis of their race, in violation of 42 U.S.C. § 2000a.

45.     Among the other acts detailed in the Fact section above and incorporated herein by reference, by refusing to enroll B.J.M. and B.E.M. in programs after the summer of 2020, while admitting non-black children, Defendant denied B.J.M. and B.E.M. the full and equal enjoyment of its facilities, services, privileges, and advantages, discriminating against them on the basis of their race, in violation of 42 U.S.C. § 2000a.

**WHEREFORE,** Plaintiff prays this Court to enter judgment in its favor and against Defendant and award the following relief:

A.     a preliminary and permanent injunction against Defendant and all of its agents, associates, affiliates, and representatives, enjoining them from discriminating against B.J.M. and B.E.M. on the basis of their race and disability;

B.     an order directing Defendant to remove the prohibition on Plaintiff's ability to enroll B.J.M. and B.E.M. in future summer camp or other programs with Defendant;

C.     a declaratory judgment that Defendant's acts and practices detailed in this Verified Complaint are unlawful and in violation of Title II of the 1964 Civil Rights Act;

D.     an award of reasonable attorneys' fees and costs; and

E.     such other legal and equitable relief as the Court deems just and proper.

### COUNT II
### VIOLATION OF TITLE VI OF THE 1964 CIVIL RIGHTS ACT
### 42 U.S.C. § 2000d

46.     Plaintiff re-alleges and re-asserts Paragraphs 1 through 37 of her Verified Complaint as though fully set forth herein.

47.     Title VI of the 1964 Civil Rights Act provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

48.     Defendant is a recipient of federal financial assistance in the form of federal grants and other funding.

49.     B.J.M. and B.E.M. are both African American.

50.     Defendant discriminated against Plaintiff's children on account of their race.  As detailed above, non-black children who engaged in conduct similar to the conduct of B.J.M. and B.E.M. were treated differently, as they were not written-up, removed from the group, touched or physically restrained, suspended or dis-enrolled.  Likewise, these children and other non-black children were not barred from registering for future programs, as Plaintiff's children were.

51.     Although aware of the discriminatory treatment that B.J.M. and B.E.M. suffered, Defendant's employees either actively participated in this treatment or were unwilling to take the necessary measures to stop and remedy it.

52.     Among the other acts detailed in the Fact section above and incorporated herein by reference, by suspending B.J.M. and B.E.M. and treating them differently than non-black campers, Defendant denied B.J.M. and B.E.M. the full and equal enjoyment of its facilities, services, privileges, and advantages, discriminating against them on the basis of their race, in violation of 42 U.S.C. § 2000d.

53.     Among the other acts detailed in the Fact section above and incorporated herein by reference, by refusing to enroll B.J.M. and B.E.M. in programs after the summer of 2020, while admitting non-black children, Defendant denied B.J.M. and B.E.M. the full and equal enjoyment of its facilities, services, privileges, and advantages, discriminating against them on the basis of their race, in violation of 42 U.S.C. § 2000d.

**WHEREFORE,** Plaintiff prays this Court to enter judgment in its favor and against Defendant and award the following relief:

A.     actual damages in an amount to be determined at trial;

B. a preliminary and permanent injunction against Defendant and all of its agents, associates, affiliates, and representatives, enjoining them from discriminating against B.J.M. and B.E.M. on the basis of their race and disabilities;

C. an order directing Defendant to remove the prohibition on Plaintiff's ability to enroll B.J.M. and B.E.M. in future summer camp or other programs with Defendant.

D. an award of reasonable attorneys' fees and costs; and

E. such other legal and equitable relief as the Court deems just and proper.

**COUNT III**
**VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT**
**42 U.S.C. § 12181 *et seq.***

54. Plaintiff re-alleges and re-asserts Paragraphs 1 through 37 of her Verified Complaint as though fully set forth herein.

55. Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182.

56. Defendant and the McCormick YMCA are places of public accommodation under 42 U.S.C. § 12181.

57. Both B.J.M. and B.E.M. suffer from ADHD, for which they receive medical treatment.

58. ADHD is a disability within the meaning of the Americans with Disabilities Act.

59. Defendant discriminated against Plaintiff's children on account of their disability. As detailed above, non-disabled children who engaged in conduct similar to the conduct of B.J.M. and B.E.M. were treated differently, as they were not written-up, removed from the group, touched or physically restrained, suspended or dis-enrolled.  Likewise, these children and other non-disabled children were not barred from registering for future programs, as Plaintiff's children were.

60.     Although aware of the discriminatory treatment that B.J.M. and B.E.M. suffered, Defendant's employees either actively participated in this treatment or were unwilling to take the necessary measures to stop and remedy it.

61.     Among the other acts detailed in the Fact section above and incorporated herein by reference, by suspending B.J.M. and B.E.M. and treating them differently than non-disabled campers, Defendant denied B.J.M. and B.E.M. the full and equal enjoyment of its facilities, services, privileges, and advantages, discriminating against them on the basis of their disability, in violation of 42 U.S.C. § 12182.

62.     Among the other acts detailed in the Fact section above and incorporated herein by reference, by refusing to enroll B.J.M. and B.E.M. in programs after the summer of 2020, while admitting non-disabled children, Defendant denied B.J.M. and B.E.M. the full and equal enjoyment of its facilities, services, privileges, and advantages, discriminating against them on the basis of their race, in violation of 42 U.S.C. § 12182.

63.     Among the other acts detailed in the Fact section above and incorporated herein by reference, by failing to implement the Inclusion Plan that Defendant and Plaintiff agreed upon for B.J.M., Defendant failed to make reasonable modifications in its policies, practices, and procedures, when such modifications were necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to B.J.M., and failed to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, thereby discriminating against B.J.M. on the basis of his disability, in violation of 42 U.S.C. § 12182(b)(2).

**WHEREFORE,** Plaintiff prays this Court to enter judgment in its favor and against Defendant and award the following relief:

A.     a preliminary and permanent injunction against Defendant and all of its agents, associates, affiliates, and representatives, enjoining them from discriminating against B.J.M. and B.E.M. on the basis of their race and disabilities;

B.     an order directing Defendant to remove the prohibition on Plaintiff's ability to enroll B.J.M. and B.E.M. in future summer camp or other programs with Defendant;

C.     An award of reasonable attorneys' fees and costs; and

D.     such other legal and equitable relief as the Court deems just and proper.

**COUNT IV**
**VIOLATION OF THE REHABILITATION ACT**
**29 U.S.C. § 794**
**(In the alternative to Counts I and II)**

64.     Plaintiff re-alleges and re-asserts Paragraphs 1 through 37 of her Verified Complaint as though fully set forth herein.

65.     The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794.

66.     Defendant is a recipient of federal financial assistance in the form of federal grants and other funding.

67.     Both B.J.M. and B.E.M. suffer from ADHD, for which they receive medical treatment.

68.     ADHD is a disability within the meaning of the Rehabilitation Act.

69.     B.J.M.'s and B.E.M.'s disabilities substantially limits one or more major life activities of them. Among others things, B.J.M.'s and B.E.M.'s disability substantially limits their ability to learn, read, concentrate, think, communicate, and work.

70.     B.J.M. and B.E.M. are otherwise qualified to participate in Defendant's programs, which is evident from the fact that Defendant admitted them into the 2020 summer camp and prior programs of Defendant.  B.J.M. and B.E.M. were also qualified to participate in Defendant's 2021 summer camp and beyond.

71.     B.J.M. and B.E.M., solely by reason of their disabilities, were denied the benefits of Defendant's program, were excluded from participation in Defendant's program, and were subject to discrimination during Defendant's 2020 summer camp, as detailed in the Facts section above and incorporated herein by reference.

72.     As a result of Defendant's discrimination, B.J.M. and B.E.M. suffered emotional harm, embarrassment, and humiliation.

**WHEREFORE,** Plaintiff prays this Court to enter judgment in its favor and against Defendant and award the following relief:

A.     actual damages in an amount to be determined at trial;

B.     a preliminary and permanent injunction against Defendant and all of its agents, associates, affiliates, and representatives, enjoining them from discriminating against B.J.M. and B.E.M. on the basis of their race and disabilities;

C.     an order directing Defendant to remove the prohibition on Plaintiff's ability to enroll B.J.M. and B.E.M. in future summer camp or other programs with Defendant.

D.     an award of reasonable attorneys' fees and costs; and

E.     such other legal and equitable relief as the Court deems just and proper.

**COUNT V**
**VIOLATION OF TITLE VI OF THE ILLINOIS HUMAN RIGHTS ACT**
**775 ILCS 5/5-101 *et seq.***

73.     Plaintiff re-alleges and re-asserts Paragraphs 1 through 37 of her Verified Complaint as though fully set forth herein.

74.     The Illinois Human Rights Act provides that "It is a civil rights violation for any person on the basis of unlawful discrimination to . . . [d]eny or refuse to another the full and equal enjoyment of the facilities, goods, and services of any public place of accommodation." 775 ILCS 5/5-102.

75.     Defendant and the McCormick YMCA are places of public accommodation under 775 ILCS 5/5-102.

76.     B.J.M. and B.E.M. are both African American.

77.     Both B.J.M. and B.E.M. suffer from ADHD, for which they receive medical treatment.

78.     ADHD is a disability within the meaning of the Illinois Human Rights Act.

79.     Defendant discriminated against Plaintiff's children on account of their race and disability. As detailed above, non-black and non-disabled children who engaged in conduct similar to the conduct of B.J.M. and B.E.M. were treated differently, as they were not written-up, removed from the group, touched or physically restrained, suspended or dis-enrolled. Likewise, these children and other non-black and non-disabled children were not barred from registering for future programs, as Plaintiff's children were.

80.     Although aware of the discriminatory treatment that B.J.M. and B.E.M. suffered, Defendant's employees either actively participated in this treatment or were unwilling to take the necessary measures to stop and remedy it.

81.     Among the other acts detailed in the Fact section above and incorporated herein by reference, by suspending B.J.M. and B.E.M. and treating them differently than non-black and non-disabled campers, Defendant denied B.J.M. and B.E.M. the benefits of Defendant's program, refused them the full and equal enjoyment of Defendant's facilities, goods, and services, thereby unlawfully

discriminating against B.J.M. and B.E.M. because of their disability, in violation of the Illinois Human Rights Act.

82.     Among the other acts detailed in the Fact section above and incorporated herein by reference, by refusing to enroll B.J.M. and B.E.M. in programs after the summer of 2020, while admitting non-black and non-disabled children, Defendant denied B.J.M. and B.E.M. the benefits of Defendant's program, refused them the full and equal enjoyment of their facilities, goods, and services, thereby unlawfully discriminating against B.J.M. and B.E.M. because of their disability, in violation of the Illinois Human Rights Act.

83.     Among the other acts detailed in the Fact section above and incorporated herein by reference, by failing to implement the Inclusion Plan that Defendant and Plaintiff agreed upon for B.J.M., Defendant denied B.J.M. and B.E.M. the benefits of Defendant's program, refused them the full and equal enjoyment of Defendant's facilities, goods, and services, thereby unlawfully discriminating against B.J.M. and B.E.M. because of their disability, in violation of the Illinois Human Rights Act.

**WHEREFORE,** Plaintiff prays this Court to enter judgment in its favor and against Defendant and award the following relief:

A.     actual damages in an amount to be determined at trial;

B.     a cease and desist order directing Defendant to refrain from any further violation of the Illinois Human Rights Act;

C.     an order directing Defendant to remove the prohibition on Plaintiff's ability to enroll B.J.M. and B.E.M. in future summer camp or other programs with Defendant.

D.     an order directing Defendant to extend to B.J.M. and B.E.M. the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of Defendant;

E.     an award of reasonable attorneys' fees and costs; and

F.     such other legal and equitable relief as the Court deems just and proper.

-18-

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

84.     Plaintiff re-alleges and re-asserts Paragraphs 1 through 37 of her Verified Complaint as though fully set forth herein.

85.     B.J.M. and B.E.M. are both African American.

86.     Both B.J.M. and B.E.M. suffer from ADHD, for which they receive medical treatment.

87.     Defendant exhibited a pattern of punishing, isolating, and ostracizing B.J.M. and B.E.M.

88.     By suspending B.J.M. and B.J.M., by treating them multiple times in a manner different from that in which it treated non-black and non-disabled campers during its 2020 summer day camp program, by excluding B.J.M. and B.E.M. on the basis of their race and disability from participation in Defendant's program, by failing to implement the Inclusion Plan agreed upon together with Plaintiff, and by refusing to enroll B.J.M. and B.E.M. in its 2021 summer camp and beyond while admitting non-black and non-disabled children to its 2021 summer camp, Defendant has displayed extreme and outrageous conduct.

89.     Defendant's conduct toward B.J.M. and B.E.M., by singling them out for punitive and corrective measures based on their race and disability, exceeded all possible bounds of decency, and was not limited to mere insults or petty oppressions.

90.     Defendant intended to cause emotional distress to B.J.M. and B.E.M., or at best manifested reckless disregard of the probability of causing emotional distress to them.

91.     That Defendant's conduct was intentional is supported by the fact that Defendant did not take any reasonable measures to correct behavior by its employees that it knew was discriminatory and likely to cause emotional distress.

-19-

92.     Defendant also did not implement the steps in the Inclusion Plan or the Restorative Practices Guide, thus acting intentionally, or at best with reckless disregard toward, causing emotional harm to B.J.M., for whom the Inclusion Plan and the Restorative Practices Guide were designed.

93.     B.J.M. and B.E.M. suffered extreme and severe emotional distress as a result of Defendant's conduct.  The distress that Defendant caused B.J.M. and B.E.M. was so intense and painful that no reasonable person could be expected to endure it, as no reasonable person today can be expected to put up with being discriminated against on the basis of race or disability.

94.     Defendant's outrageous conduct was the actual and proximate cause of B.J.M.'s and B.E.M.'s emotional distress.  B.J.M. and B.E.M. attended other summer camps with Defendant without these problems occurring.  Only at the McCormick YMCA were B.J.M. and B.E.M. subject to discriminatory conduct based on their race and disability.

**WHEREFORE,** Plaintiff prays this Court to enter judgment in its favor and against Defendant and award the following relief:

A.     actual damages in an amount to be determined at trial; and

B.     such other legal and equitable relief as the Court deems just and proper.

### COUNT VII
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
#### (In the alternative to Count VII)

95.     Plaintiff re-alleges and re-asserts Paragraphs 1 through 37 of her Verified Complaint as though fully set forth herein.

96.     B.J.M. and B.E.M. are both African American.

97.     Both B.J.M. and B.E.M. suffer from ADHD, for which they receive medical treatment.

98.     As a place of public accommodation, Defendant and its McCormick YMCA have a duty of care to participants in its summer camps.  As such, Defendant and its McCormick YMCA had a duty of care to B.J.M. and B.E.M. during the entire period of their participation in its summer camps.

99.     Defendant breached that duty of care to B.J.M. and B.E.M. by, among other things, singling B.J.M. and B.E.M. out for punitive and corrective measures because of their disabilities, and failing to implement the steps in the Inclusion Plan or the Restorative Practices Guide for B.J.M.

100.     B.J.M. and B.E.M. suffered extreme and severe emotional distress as a result of Defendant's conduct.

101.     Defendant breached its duty of care to B.J.M. and B.E.M. by treating them multiple times in a manner different from that in which it treated non-black and non-disabled campers during its 2020 summer day camp program, by excluding them on the basis of their race and disability from participation in Defendant's program, by failing to implement the Inclusion Plan agreed upon together with Plaintiff, by allowing B.J.M. and B.E.M. to suffer physical pain without taking proper remedial measures, and by singling them out for punitive and corrective measures based on their race and disability.

102.     Defendant's breach of its duty of care to B.J.M. and B.E.M. was the actual and proximate cause of B.J.M. and B.E.M. suffering physical injury and illness.

103.     B.J.M. and B.E.M. suffered damages as a result of Defendant's breach of its duty of care. They displayed both physical symptoms and severe and extreme mental pain and anguish, as exemplified in B.J.M.'s suicidal comments.

**WHEREFORE,** Plaintiff prays this Court to enter judgment in its favor and against Defendant and award the following relief:

A.     actual damages in an amount to be determined at trial; and

B.      such other legal and equitable relief as the Court deems just and proper.

## COUNT VIII
## BREACH OF CONTRACT

104.    Plaintiff re-alleges and re-asserts Paragraphs 1 through 37 of her Verified Complaint as though fully set forth herein.

105.    Plaintiff and Defendant entered into a contract for the enrollment of her children, B.J.M. and B.E.M., into Defendant's summer camp program in exchange for the payment of funds and other good and valuable consideration.

106.    By suspending B.J.M. and B.E.M. and terminating the program for them early, Defendant breached the contract it had with Plaintiff.

107.    Moreover, among the terms of the contract were those agreed upon and incorporated into the Inclusion Plan, which served to induce Plaintiff to utilize Defendant's services and program.

108.    Despite Defendant's agreement to employ the specific strategies embodied in the Inclusion Plan, Defendant failed to do so.  Among the breaches are the following:

        a.    The Inclusion Plan states that Defendant's staff "will communicate concerns and behavior incidents with Andrea Adams in a timely manner so that appropriate action may be taken."  Yet, on August 10, 2020, B.J.M. suffered an injury to his head, requiring treatment with an ice pack, but Plaintiff was not notified.  On another occasion in August 2020, another camper hit B.J.M. on the head several times, once again requiring treatment with an ice pack, but Plaintiff was not notified.  Moreover, La Luz refused Plaintiff's request to view any incident reports involving B.J.M. drafted by Defendant's staff, preventing communication of concern by hiding relevant information.

b.  The Inclusion Plan requires Defendant's staff to "[u]se positive framing to describe the desired behaviors at camp." Yet, this was not implemented. For example, on August 13, 2020, Pearson caused the entire camper group to suffer punishment due to the purported behavior of B.J.M., making him an outcast and placing incredible social pressure on him to control behaviors that his disability prevented controlling. This resulted in suicidal ideation. Yet, once this was vocalized, Barclay and Rundquist admonished B.J.M. that statements of that ilk were "inappropriate."

c.  The Inclusion Plan provides that "McCormick Y staff will review the following topics and resources in the Y's online learning library: Behavior Basics & Supporting Behavior; ADHD; Check In-Check Out systems; Positive Framing." However, upon information and belief, Defendant did not require the staff at the McCormick YMCA to review these documents, and they did not do so by-and-large.

d.  The Inclusion Plan incorporated the Restorative Practices Guide, which were also not followed. For example, during the August 13, 2020 incident where Pearson caused the entire camper group to suffer punishment due to the purported behavior of B.J.M., Pearson did not ask B.J.M. the second stage question of "How were you feeling and what were you needing?" instead causing the entire group to blame B.J.M. for their loss. Likewise, neither Barclay nor Rundquist implemented the sequential procedure outlined in the Restorative Practice Guide later the same day, instead admonishing him for vocalizing suicidal ideation (something they also did on July 27, 2020) and reprimanding him for his behavior. Moreover, neither La Luz, Coach Sean,

nor any other person from Defendant's staff were able to name a single policy in the Inclusion Plan or the Restorative Practices Guide, when questioned by Plaintiff.

109.     In addition to violating the terms of the Inclusion Plan, Defendant also violated proper protocol and procedure in reporting incidents. The protocol and procedure is part of the contract between Defendant and Plaintiff, as user of Defendant's goods and services.  As noted, on at least two occasions, Plaintiff was not notified about incidents involving B.J.M. (once, when B.J.M. was hit in the head by another camper, and the second time during the week of August 10, when B.J.M. fell and hit his head on the ground), although protocol mandates such notification. Further, Defendant's staff failed to log incidents involving Plaintiff's children in the log book, constituting a spoilation of evidence.

110.     Defendant also breached its obligations under the YMCA of Metro Chicago Diversity and Inclusion Policy, a copy of which is attached hereto as Exhibit C.  This policy provides, in pertinent part, that "[t]he YMCA of Metro Chicago will not discriminate against any individual with a disability on the basis of disability with regard to the full and equal enjoyment of the goods and service of the YMCA of Metro Chicago."  This policy is part of the contract between Defendant and Plaintiff, as user of Defendant's goods and services.   Defendant violated this policy by discriminating against B.J.M. and B.E.M. on the basis of their disabilities.

111.     As a proximate cause of Defendant's breaches, Plaintiff and her children have suffered damages.

**WHEREFORE,** Plaintiff prays this Court to enter judgment in its favor and against Defendant and award the following relief:

A.     actual damages in an amount to be determined at trial; and

B.     such other legal and equitable relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a jury trial on all issues that may be tried and decided by a jury.

Dated:  February 8, 2024

Kenneth J. Ashman (ARDC 6206515)
Ioan-Radu Motoarca (ARDC 6339424)
ASHMAN LAW OFFICES, LLC
2801 Orange Brace Road
Riverwoods, Illinois  60015
312.596.1700 (p)
kashman@ashman.law

ANDREA ADAMS, as parent/guardian of
B.E.M. and B.J.M., minors,

_____
By:  One of Its Attorneys

<u>**VERIFICATION**</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts contained in this instrument are true and correct.

Executed on:  February 8, 2024          By:_____
                                                  Andrea Adams

# EXHIBIT A



**the**

**FOR YOUTH DEVELOPMENT®**
**FOR HEALTHY LIVING**
**FOR SOCIAL RESPONSIBILITY**

BJM

McCormick Y - Summer 2020

BJM is 11 years-old and attending McCormick Y this summer. His mother, Andrea Adams, describes BJM as a great, amazing kid who loves sports, video games, his skateboard, drawing and sketching, and who has an interest in stocks and investing. BJM also has a diagnosis of ADHD and has difficulty staying focused. Braylon typically will respond well to redirection, however, he will need a lot of it. Y staff should keep in mind that when behavior challenges present, the purpose is not "naughtiness," or non-compliance, rather BJM brain is moving 1,000 miles and minute. He doesn't necessarily have the "pause" button that helps him to stop and think before he acts (i.e. impulse control).

In general, BJM gets along well with others. His peers generally like him. He has a big personality, and at times may interrupt others. He may wander and will need reminders to stay with the group.

The Inclusion Department recommends that this support plan be used by McCormick Y to the best of their abilities. It describes the strategies that may be used by the YMCA staff in order to encourage, and support positive behaviors and in the day camp program.

If possible, designate an additional staff person to BJM group to provide more individualized redirection and support to BJM.

If staffing does not permit an additional staff person to be assigned to BJM group, consider designating a staff member as a point-person for BJM. This staff should be someone with whom BJM has already (or has the ability to) establish good rapport. This person may not be consistently a part of his camp group, but should be available upon BJM arrival to camp and at periodic intervals throughout the day to provide feedback support to Braylon.

Recommended strategies for McCormick Y to implement:

1. Check-In/Check-Out: A system to support behavior that involves a daily routine where a camper:

   - Checks in each morning with a designated adult (i.e. the point-person) to develop daily behavioral goals



- Carries a point card throughout the day where adults provide behavioral feedback regarding the goals
- Returns to the designated adult (i.e. the point person) at set intervals throughout the day of the day to review feedback and calculate points earned for the day
- Gives the point card to a parent after camp – parent signs for the camper to return the card to camp on the following day
- The point system is tied to tangible rewards (can be daily or weekly)

2. Positive reinforcement and specific praise. Recognize and provide specific feedback for positive behavior (even behaviors that seem minor to staff)

3. Use positive framing to describe the desired behaviors at camp.

4. Make sure that staff has BJM attention when providing directions or redirection. Make sure to have eye contact, move closer to BJM, or say his name, rather than shouting direction group-wide.

5. Provide frequent reminders for staying with the group and for minding personal space.

6. Find and use moments to help promote "stop and think" before acting on an impulse. These can be teachable moments group-wide, not solely pertaining to BJM. Finding and discussing these moments can help reinforce the concept of the cause and effect of behavior.

7. McCormick Y staff will communicate concerns and behavior incidents with Andrea Adams in a timely manner so that appropriate action may be taken.

8. McCormick Y staff will review the following topics and resources in the Y's online learning library:
- Behavior Basics & Supporting Behavior     https://ymcachicago.litmos.com/?C=1924356
- ADHD                                       https://ymcachicago.litmos.com/?C=1938150
- Check In-Check Out systems                 https://ymcachicago.litmos.com/?C=1938233
- Positive Framing                           https://ymcachicago.litmos.com/?C=1938242

 **the**

**FOR YOUTH DEVELOPMENT®**
**FOR HEALTHY LIVING**
**FOR SOCIAL RESPONSIBILITY**

The YMCA requests the following from **Andrea Adams**, regarding ▉BJM▉ enrollment in the McCormick YMCA day camp:

1. She be willing to meet with McCormick Y staff to discuss ▉BJM▉ needs including providing additional suggestions for supportive strategies, should the McCormick Y Program Director deem necessary.

2. She understands that children receiving inclusion support are subject to the same character contract, pledge, behavioral expectations and protocol as all other program participants as found in the Emergency Information Packet or Parent Handbook at the time of enrollment. The McCormick YMCA day camp program will use their established procedures to communicate behavioral incidents, if necessary.

3. She understands that the McCormick YMCA reserves the right to discontinue ▉BJM▉ enrollment in its programs or facilities if his behavior is unmanageable and poses a danger to the physical or emotional safety of himself or others. This decision is at the discretion of the McCormick YMCA.

_____
Andrea Adams Parent/Guardian

_____
Date

_____
Spencer Barclay
Program Director
McCormick YMCA

7/21/20
_____
Date

Plan Created By:

*Gretchen Dennis*

Gretchen Dennis, CTRS
Manager of Inclusion

Date: 7/13/2020

# EXHIBIT B

EXHIBIT B

 (/)

☰

# Restorative Practice: 6 Questions That Improve Behaviour

**Click here to download our free Restorative Practice Pack with printable resources (https://trackitlights.com/restorative-practice-pack.html)**

Some schools have managed to completely transform their culture through Restorative Practice. 'Restorative Justice' can be used as an alternative to 'Punitive Justice' and focuses on addressing the root cause of the behaviour, what damage the behaviour has done and how to repair the damage. When done successfully it's used to develop mutual respect, empathy, consideration, emotional intelligence, intrinsic motivation, taking responsibility and pretty much everything else we are trying to achieve when addressing behaviour!.

Restorative Practice principles can be incorporated into all aspects of school life but in this tip, we are focusing on responding to challenging behaviour or conflict in a way that avoids criticism, blame and retribution. A Restorative conference involves asking a pupil or a group of pupils, questions that promote reflective thinking and allowing others the opportunity to listen and empathise. The goal is for the pupils to come to realisations themselves about why they behaved in the way they did and the consequences of it. It uses the power of communication to build understanding and empathy between the different people involved, so respect and consideration drive positive behaviour, rather than just following school rules because they have to.

Rewards such as class points, praise, star of the day and merit certificates provide valuable recognition, fun and a strong sense of achievement which children thrive on, but there is a fine line between giving pupils much-needed recognition and relying on rewards to coerce work or good behaviour out of children against their will. We want children to primarily acknowledge that making positive choices is rewarding in and of itself and then use external rewards and praise to further reinforce that message. Similarly, with punishments, they can discourage destructive behaviour, but if a child is only being respectful to avoid punishment, children are motivated by self-preservation rather than consideration, respect and care for others. So how do we develop self-motivated pupils, who want to make positive decisions out of their autonomy? Restorative Practice is a great place to start.

As adults, we generally make decisions based on past experiences and the consequences of our actions. For example, we have learnt that the consequence of being disrespectful is that it damages relationships. We don't like the consequences of damaging relationships, so treating people with respect becomes one of our core values. Contrary to what many disciplinarians might think, we haven't learnt this through discipline, we have learnt it through making mistakes, damaging relationships, not liking the results, and doing something different the next time. This is the process that Restorative Practice nurtures.

Restorative Conference

A Restorative Conference takes place after the incident, once everyone involved has calmed down. The teacher's role is similar to a counsellor. Their job is empathetic listening. Empathy isn't the same as sympathy. Empathy is understanding someone else's experience regardless of whether you agree or not. Often empathy is enough for a conflict to de-escalate because in many conflicts, peoples' most significant unmet need is to be heard and understood. If two or more people are reflecting, each person will have a different experience of events and its likely they won't agree. The listener's initial job is to listen to everyone's experience and check understanding.

# The 6 Questions to behaviour reflection

## 1) What happened?

This is an opportunity to model the empathy and respect we want the pupil to develop. At this stage, the objective is for the pupil to feel understood and heard.

- **Listen (use facial gestures and body language, and small words eg. 'yes', 'okay', 'I see', 'um'... to demonstrate active listening)**

- **Ask questions if necessary**

- **Check if you understand properly (do you mean...?)**

- **If they use this as an opportunity to justify themselves, let them. The objective at this stage is for the pupil to feel heard and understood, not corrected.**

- **If what the pupil is saying isn't an accurate reflection of the truth ask inquisitive questions and check understanding: 'are you saying that this happened?'**

Click here to download the 'Listening Wheel' as part of our 'Restorative Practice Pack'. (https://trackitlights.com/restorative-practice-pack.html)

## 2) How were you feeling and what were you needing?

Simply identifying and understanding the underlying feelings and needs that cause behaviour can often be enough to resolve it. A Feelings and needs card can be really helpful for this. –

- **Suggest feelings and needs if necessary**

- **Respond with empathetic body language and facial expressions.**

Click here to download our 'Feelings and Needs card' as part of our 'Restorative Practice Pack'. (https://trackitlights.com/restorative-practice-pack.html)

## 3) What were you thinking?

The objective at this stage is to help the pupil express their perspective at the time of the incident. This is a great opportunity to for the listener to model empathy which de-escalates any existing conflict and lays the ground work for encouraging the pupil to empathise with others in the next question.

- **Listen**

- **Ask questions**

- **Check understanding**

## 4) Who else has been affected? What do you think might be feeling?

The objective at this stage is to help the pupil develop empathy and emotional intelligence towards others. How you modelled empathy when listening to the pupil in the previous stages will directly impact how well the pupil will be able to empathise with others now.

- **Listen**

- **Use the needs and feelings card**

- **Ask questions**

- **Make suggestions if necessary**

## 5) What have you learnt and what will you do differently next time?

This is an opportunity to work with the pupil to find strategies moving forward for them to meet their needs in a way that will also be respectful of other people needs. If there doesn't seem to be an easy solution, for example, they are bored in maths and they have rejected all ideas about how they could make it more fun for themselves, revert to empathy and sympathise with the challenge. The goal with Restorative Practice is to get everyone one step closer to meeting their needs whilst improving communication, understanding and empathy for one another

- **Listen**

- **Ask questions**

- **Check understanding**

- **Summarise**

## 6) How can the damage be repaired?

This step is often missed with 'Punitive Justice' where a pupil might have to do a detention but won't necessarily repair the damage. Giving the responsibility to the pupil to correct their behaviour is arguably far more effective than a punishment for many reasons. The process of apologising to the class, replacing broken equipment, sanding down a defaced desk etc. deters them from doing it again without the need for punishment, it gives everyone involved a sense of resolution and anyone who was negatively impacted is left feeling touched rather than resentment.

Make Restorative Practice simpler and click here to download our 'Restorative Practice Pack Featuring worksheets, a learning wheel, and needs and feelings cards, the pack is the ideal resource to support your classroom behaviour management. Some schools have managed to completely transform their culture through Restorative Practice.

**Click here to download our 'Think Sheet' as part of our 'Restorative Practice Pack'. (https://trackitlights.com/restorative-practice-pack.html)**

# Why wait sign up to Trackit Lights today

**Try Trackit Lights**

| Trackit Lights | Legal |
|---|---|
| **Home (/)** | **TOS (/terms.html)** |
| **Pricing (/pricing)** | **Privacy (/privacy.html)** |
| **Resources (/resources/)** | Support |
| | **Contact (/contact.html)** |

**Download MSI**
**(/files/Trackit-Lights-**
**Download.msi)**

**Schedule a demo**
**(/demo/)**

**Login (https://trackit-**
**lights.azurewebsites.net/)**

**Purchase Trackit Lights**
**(/sign-up/)**

# Restorative Questions

**To respond to challenging behavior…**

- ➢ **What happened?**
- ➢ **What were you thinking at the time?**
- ➢ **What have you thought about since?**
- ➢ **Who has been affected by what you have done?**
  - ➢ **In what way?**
- ➢ **What do you think you need to do to make things right?**

**To help those harmed by other's actions…**

- ➢ **What did you think when you realized what had happened?**
- ➢ **What impact has this incident had on you and others?**
- ➢ **What has been the hardest thing for you?**
- ➢ **What do you think needs to happen to make things right?**

# EXHIBIT C

EXHIBIT C



**the**

**C**

# Diversity & Inclusion

## Strengthening communities through diversity & inclusion

We believe that everyone, regardless of gender, income, faith, ability, sexual orientation or cultural background, has the right to live life to its fullest. We share the values of caring, honesty, respect, and responsibility.

We work in 27 program and member centers, five resident camps, and hundreds of extension sites in schools and in communities throughout the region. We know that the key to effectively nurturing the potential of children, improving Chicagoland's health and well-being, and supporting our neighbors is a passionate, experienced and diverse array of staff, volunteers, members and partners who value all people, actively promote inclusion, and celebrate cultural differences.

By intentionally infusing diversity and inclusion strategies into everything that we do -- including staff hiring and training, environmental design, strategic planning, marketing materials, program offerings, and more -- we work to ensure that every segment of society feels welcome and is supported by the Y.

## The YMCA of Metro Chicago prohibits discrimination on the basis of disability

The YMCA of Metro Chicago will not discriminate against any individual with a disability on the basis of disability with regard to the full and equal enjoyment of the goods and services of the YMCA of Metro Chicago. The YMCA of Metro Chicago will make reasonable modifications to its policies, practices, or procedures when necessary to afford its goods and services to individuals with disabilities unless the YMCA of Metro Chicago can demonstrate that making the modifications would fundamentally alter the nature of its services or result in an undue burden, i.e. significant difficulty or expense.

The YMCA of Metro Chicago will take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the YMCA of Metro Chicago can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden, i.e., significant difficulty or expense.

The YMCA of Metropolitan Chicago invites persons with disabilities to enjoy Y programs and facilities. If you require a reasonable modification due to a disability to enjoy any of our programs, please inform center staff or email **inclusion@ymcachicago.org**.

## More information

**Policy on Diabetes Management**
**Diabetes Medical Management Plan (DMMP)**